PEOPLE'S BUILDING AND LOAN ASSOCIATION OF THE TOWN OF HARRISON, IN THE COUNTY OF HUDSON,

*v.*

THOMAS FUREY et ux.

1. Act N. J. April 9th, 1875, relating to building and loan associations, repealed so much of act February 28th, 1849, as authorized the taking of premiums for loans.—*Held*, that a building and loan association organized under the act of 1849 was entitled to the benefit of act February 29th, 1876, which again permitted the taking of premiums without reorganizing under this last act.

2. A building and loan association which has loaned money to one of its stockholders on a bond and mortgage conditioned for the payment of a specified rate of interest, together with a monthly installment on each share of the

stock owned by him, until the principal sum is paid, can recover, on fore-closure, the amount in arrear, without any deduction for the monthly install-ments paid by the stockholder, as he will receive the benefit of such install-ments in the increased value of his shares.

3. The constitution of a building and loan association (article XIII., section 9) provides that any borrower may repay a loan at any time, and, in case the repayment is made before the expiration of the eight years after the series in which his stock was issued, such borrower shall be given credit for "whatever interest he may be entitled to receive, as provided in article XI., section 6." Article XI., section 6, provides that, on the withdrawal of a non-borrowing member stockholder, he shall be repaid the amount of his installments, together with specified rates of interest, depending on the length of time he had been a member.—*Held*, that a borrowing stockholder, who has made ad-vance payments on his loan, is entitled, on withdrawal, to interest on such ad-vance payments at the same rate as a withdrawing non-borrowing stockholder on his installments.

4. A building and loan association which demands, as a condition of the withdrawal of a borrowing stockholder, a greater sum than that is due to it, and which persists in such demand after its attention has been called to the error, is in no position to urge that the stockholder has lost his right to with-draw by his non-action for several years thereafter, where he offered to pay the amount actually due the association at the time of his proposed with-drawal, and has been ready and willing to settle on that basis ever since.

On bill, answer and proofs.

*Mr. Thomas J. Lintott,* for the complainant.

*Mr. Gilbert Collins* and *Mr. James J. Furey,* for the defendants.

PITNEY, V. C.

This is a bill to foreclose two several mortgages—one dated November 22d, 1879, for $1,000, and one of later date for $1,200. The latter was paid, or otherwise arranged, during the progress of the suit, and at the hearing was withdrawn from con-sideration.

The dispute is as to the amount due (if anything) upon the mortgage for $1,000.

The complainant was organized in 1873 under the act of Feb-ruary 28th, 1849 (*P. L. of 1849 p. 227*), by certificate duly filed in the proper offices, and has never been reorganized under the

act of April 9th, 1875 (*Rev. p. 92*), and the supplement of March 15th, 1876 (*P. L. of 1876 p. 32; Rev. p. 1272*), but has continued to do business under the original organization by starting and issuing a new series of stock each year. It commenced such a series, being the seventh, in September, 1879, and the defendant became a holder of five shares of that series of $200 each, upon which he became liable to pay $5 each month. In November of that year he procured a loan from the complainant of $1,000, paying therefor a premium of $135, receiving in net cash $865, and giving therefor the bond and mortgage in question; and, as additional security, assigned to the association his five shares of stock of the seventh series.

The first question raised by defendant relates to this premium.

The act of 1849, which authorized the taking of such premiums, was repealed by the general repealer of 1875, and the act of April 9th, 1875, was substituted for it. The substituted act did not authorize the taking of premiums for loans. That feature of the act of 1849 was added to the substituted act by the amendment of February 29th, 1876 (*P. L. of 1876 p. 22; Rev. p. 1272*).

Counsel for the defendant contended that complainant could not have the benefit of this act without reorganizing under it. But the contrary was held by this court in *The Freehold Mutual Loan Association* v. *Brown, 2 Stew. Eq. 121*. It follows, that the element of the payment of the bonus has no effect upon the rights of the parties.

The condition of the bond given is, in substance, as follows: That the defendant should pay complainant the interest at the rate of one-half of one per centum per month on the principal sum of $1,000, with the regular monthly installment of $1 on each of the shares of stock owned by him, on the third Tuesday of each month—"until the said principal sum of one thousand dollars shall be paid"—and in case of neglect for six months to make such payment the whole principal sum shall become due. There is also a condition to pay the fines imposed under the constitution by the association, and also to pay taxes.

It was contended by the defendant, that payments made and

received under the clause above quoted were, by force of the language used, payments on account of principal as well as interest. Such would perhaps be the effect of the language if read by itself and without looking to the constitution of the association and a consideration of its object and scheme.

But the contrary has been held by this court and the court of errors and appeals in *The Mechanics Building and Loan Association* v. *Conover, 1 McCart. 219; sub nom. Herbert* v. *Mechanics Building and Loan Association, 2 C. E. Gr. 495.* Chief-Justice Green discusses the question at *pp. 223, 224* of *1 McCart.*, and this part of his opinion is approved by the court of errors and appeals in *2 C. E. Gr.*

It follows, that the only mode in which the defendant can have his payments applied toward the principal is by going through the process of withdrawing from the association under the provisions in its constitution for that purpose, hereinafter to be cited.

In the case in hand, the defendant not only paid his regular dues promptly for two or three years, but actually paid large sums in addition thereto; and it is these overpayments that have given rise to the controversy in this case.

It is admitted that these advance payments were mingled with the other moneys of the association, and immediately loaned out by it, and that it has received interest on them ever since.

Section 9 of article XIII. of the constitution of the complainant's association is as follows :

"Any borrower, who is not in arrears to the association, may repay a loan at any time, and in case of the repayment thereof before the expiration of the eighth year after the series in which his or her stock was issued, such borrower shall be allowed the following credit, viz.: The amount of installments actually paid into the association, on the respective series, and one-eighth of the premium paid for said loan, for every full year of the said eight years, unexpired, together with whatever interest he or she may be entitled to receive, as provided in article II., section 6."

The section so referred to is as follows :

"Any non-borrowing stockholder wishing to withdraw from this association, may do so by giving a written notice to the secretary five days prior to the

meeting of the board of directors, which shall be held on the evening of the
second Monday after the regular monthly meeting held on the third Tuesday
of the month, of such intention to withdraw" &c., &c. "During the first year
of his or her respective series of stock, he or she shall be entitled to receive
the actual amount of installments paid in, less any fines he or she may owe
and his or her proportion of the expenses of the association; after the expira-
tion of the first year, he or she shall receive the actual amount of installments
paid in, less any fines he or she may owe, with interest at the rate of four per
cent. per annum; after the expiration of the second year, five per cent. per
annum; after the expiration of the third year, six per cent. per annum; after
the expiration of the fourth year, seven per cent. per annum; after the expira-
tion of the fifth year, eight per cent. per annum; after the expiration of the
sixth year, nine per cent. per annum; after the expiration of the seventh year,
eleven per cent. per annum; and after the expiration of the eighth year, thirteen
per cent. per annum."

The defendant, in his dealing with the company, acted through
the agency and under the advice of his son, James J. Furey, a
solicitor of this court. The son swore that these overpayments
were made upon the express promise made by Mr. Riordan, the
secretary of the company, in the presence of the directors, and
repeated many times afterwards, that interest would be allowed
the defendant for such overpayments. This is denied by Riordan
and by one of the directors. But, considering all the circum-
stances, and the evidence, as well that of the son as the daughter,
I think the weight of it is with the defendant, and that he was
justified in supposing that he would in some way receive interest
on his overpayments. And this would be in accordance with the
manifest justice of the case. For, while it is manifestly unfair,
as shown by Chancellor Green in the case in *1 McCart.*, that the
shareholder should have the benefit of his monthly payment of
dues on his shares of stock as direct payments on his bond, and
at the same time share with the other members of the association
in the profits derived from the employment of the dues paid by
those other members, it is equally unfair that when he has made
payments in excess of his dues, those other members should have
the benefit of the profits to be derived from the employment of
such overpayments.

The first overpayment was made January 20th, 1880. Two
days later Mr. J. J. Furey wrote Mr. Riordan a note of inquiry,

which has not been produced, and therefore we know nothing of its tenor, except as is indicated by Mr. Riordan's answer, under date of February 2d, 1880, which is as follows:

"Your favor of the 22d ult., with inclosure, came duly to hand. I noted your request for information regarding the terms of our association in settling with a borrowing member prior to maturity. * * * I would state that our association is so organized, as you will perceive by referring to the constitution, a copy of which I inclose, on purely democratic principles, borrowing as well non-borrowing members have the option of coming in and going out of the association, merely observing certain simple rules as are laid down. As to the payment of loans before maturity you will find, according to article 13, section 9, that on the payment of their loan, they are allowed all the installments on their stock paid in, together with interest on the same as they may be entitled according to article 2, sec. 6, and also a rebate of the premium paid for their loan equal to $\frac{1}{8}$ of the same for every full year of 8 years of their stock unexpired—provided they settle before the commencement of the eight years.

"As an illustration, we will take your father's case, 2 years hence, when 6 of the 8 years of the stock will remain unexpired:

```
"DR. To loan.................................................................... $1,000 00
"CR. By installments on 5 shares of stock paid up for 2
        years....................................................... $120 00
    "By int. on same for average time on investment,
        viz., 1 year at 5 per cent................................     6 00
    "By ⅝ rebate of prem. $135...............................   101 25
                                                           ----------
                                                                         227 25
                                                                      ----------
"Amt. he would have to pay Sept. 1, 1881............................... $772 75"
```

After receiving the above letter, defendant continued to make overpayments from time to time, interspersed between the regular stipulated payments of $10 per month.

In the spring of 1882 he asked for, and received, a statement showing how he stood with the association, which, however, was not produced at the hearing. In the meantime he had subscribed to other series of stock, viz., six shares in the eighth series of 1880 and eight and one-half shares in the ninth series of 1881.

In the early fall of 1882 he duly notified the association that he desired to pay his loan of $1,000, and to withdraw from the association as to the five shares of the seventh series assigned as collateral to that loan, and also as to the eight and one-half shares in the ninth series.

This notice was acted upon by the board of directors, and resulted in a letter from the secretary, as follows:

"HARRISON, N. J., Oct. 24, '82.

*"Mr. Thomas Furey:*

"DEAR SIR—In pursuance with your desire to settle your first bond and mortgage to the association on the premises No. 40 Sussex street, Jersey City, N. J., the same being granted at the last meeting of the board of directors, I hereinafter submit to you statement of your account, showing the amount which you will require to pay in settlement to be $180.67. Final settlement can be made at the meeting of the board of directors, which will be held on Monday evening next.

"Please bring with you your certificate of stock for the 8½ shares in 9th series.        "Yours truly,

"JOHN W. RIORDAN, *Sec.*

" MR. THOMAS FUREY,

"IN ACCOUNT WITH

"THE PEOPLE'S BUILDING AND LOAN ASSN.

"DR. To loan Dec. 1879, as per bond and mortgage.................... $1,000 00

"CR. By installments pd. on 5 shs. 7th series, 38

    mos....:.......................................... $190·00

    "Int. on same, at 6 per cent., 19 m.......... 18 05

                       ————— $208 05

    "By installments pd. on 8½ shares 9th

    series, 14 mos................................ $119 00

    "Int. on same 7 mos., at 4 per cent......... 2 78

                       ————— 121 78

    "Rebate returnable on premium paid for loan, 13½

    per cent., being ½ of $135............................. 67 50

    "By advance payments..................................... 422 00

                       ————— 819 33

"Leaving balance due this date, Oct. 17, 1882.......................... $180 67"

Mr. J. J. Furey at once protested against the accuracy of this statement, and demanded that the defendant should have credit for interest on his advance payments as well as upon his regular payments, and claimed that such interest would amount to about $40, and would reduce the amount due from the defendant on his mortgage to $140, which he offered to pay. He does not say that he tendered that amount of money, but he said he had it in his pocket to pay, and that he offered to pay it. Mr. Riordan declined to accept a less amount than that mentioned in his statement, or to act upon Mr. Furey's view to any extent. The matter rested in that shape until the next meeting of the directors,

in January, 1883, which meeting Mr. Furey attended and pressed his views as to interest upon the advance payments, but without avail, the directors standing by their secretary.

In that shape the matter has stood ever since.

In January, 1883, Mr. Furey took credit in his pass-book, containing entries of payments on account of series No. 7, for the withdrawal value of series No. 9, being the sum of $148.35, and he paid further in cash upon his pass-book on series No. 7— December 20th, 1887, $20, and in January and February, 1888, $10 each. The value of the shares of stock has not yet reached $200 each, but the whole of the shares of defendant's stock, series No. 7, is stated by the complainant to be worth $838.56 on the 1st day of January, 1890.

The theory of the complainant is, that the duty of the defendant to make monthly payments of $5 for interest on his bond and $5 for dues on his stock has continued ever since 1882, notwithstanding what occurred in regard to the defendant's withdrawal in that year; and that the previous overpayments must be applied for that purpose without any allowance for interest; and that, so applying them, they were exhausted in the spring of 1888, and that in the fall of 1888 the defendant became six months in arrear, and thereby lost his right to withdraw and subjected himself to foreclosure; and it claims that there should be a decree for the principal sum of $1,000, together with the monthly payments of $10 since April, 1888, leaving the defendant the owner of the five shares assigned as collateral if the mortgaged premises shall produce sufficient to pay the decree.

While counsel for the complainant contends that the failure of the defendant to pay his dues for six months has deprived him of the right to the benefit of a withdrawal under the constitution, I understood him to express a willingness that defendant should be credited with the value of the five shares of stock as ascertained from the books of the company. And he further contends, that if the court should be of opinion that the defendant is entitled to the benefit of a withdrawal under the constitution, then that he is to be credited with interest on his payments from the time they accrued due, and not from the time they were

27

actually paid, and that the amount of the interest is to be ascertained not by the constitution as it stood at the time the loan was made, but as it was afterwards, to wit, in the year 1882, amended by proceedings taken for that purpose.

It thus appears that the first question to be determined is, whether or not the defendant is entitled to the benefit of a withdrawal as of October, 1882, and that involves the further question, whether or not he was right in his contention that he was entitled to credit for interest upon his advance payments.

As to the question of his right upon a withdrawal to interest on his advance payments, I think it must be resolved in his favor. Standing on the language of article II., section 6, above quoted, it seems to me that interest must be allowed from the time of the actual payment. Complainant cannot avoid treating the advance payments in this case as either payments on account of the principal sum of $1,000, or as payments in advance on account of the five shares of stock. These payments are entered on the book as payments on account of the shares. They are *installments actually paid in*, and answer the description, found in the article in question, of the moneys upon which a withdrawing member is entitled to interest. The contention of the complainant was, and it is attempted to be supported by evidence, that the defendant made these advance payments as mere deposits of so much money with the association which were not to draw interest until he was ready to pay the whole of the indebtedness. I cannot believe that such was the understanding of the parties. The circumstances show that the money was borrowed on the supposition that it would be needed to pay a mortgage which the defendant had given as collateral to a mortgage which his daughter owed to one Brinkerhoff, and it turned out that when the collateral mortgage came due the mortgagee did not need the money and would not accept it. The complainant's theory was, that the original loan to the defendant was such a great favor to him, and he was in such pressing need of it, that he made these payments in advance out of gratitude to the association for helping him in his time of need. I am unable to believe that the complainant's theory is founded in fact. But, as already remarked, I am satis-

fied the defendant expected in some way to get the benefit of
interest upon his advance payments, and their being credited on
a pass-book, kept for the purpose of crediting payments on account
of interest and dues on shares of stock, tends to show that they
must be treated either as payments on the bond or on account of
the dues on the stock.

The more difficult question is, whether or not the defendant is
entitled to have the benefit of a withdrawal as of October, 1882.
If this question is answered in the affirmative, he will be entitled
to a credit upon the balance of $180.67 (shown by Mr. Riordan's
statement) for the interest on the advance payments, and then to
be charged with interest upon such balance to date, and to be
credited on such interest with the payments made since that date
upon the seventh and ninth series of shares.  If, however, the
adjustment is to be made as of a later date, the problem becomes
more complicated and apparently less advantageous to the de-
fendant.

Counsel for the complainant contends, that although the de-
fendant proposed to withdraw, as to the series in question, and
took measures to do so in 1882, he in fact never did withdraw,
but permitted his payments to fall in arrear and thereby lost his
right to withdraw, and, without his right to withdraw, he is not
entitled to interest on his payments, under the constitution.  In
this last position the complainant is probably right, and the
question, whether or not the defendant will receive any benefit
in the way of interest on his advance payments, will depend upon
whether or not he has lost his right to a withdrawal as of Octo-
ber, 1882.

. Now, on this question, it seems to me that the defendant did
all that the complainant had any right to demand of him at that
time, granting, of course, that he was right in his demand for
more interest.   It seems to me that it does not lie in the mouth
of the complainant to say to the defendant, you should, at your
peril, have made up a statement of the amount which you admitted
to be due, say $140, and have tendered that sum of money, and
then have filed a bill to redeem, and, failing to do that, you have
lost your footing of 1882.

I have come to the conclusion that the complainant was wrong in its demand; that it demanded, as a term of surrendering the mortgage to be canceled, the payment of a greater sum of money than was due to it, and that having made that wrongful demand, and having persisted in it after its attention was called to the error, that it has continued in the wrong ever since, and that such wrongful position is a sufficient excuse for defendant's non-action.

The only question is, whether or not the defendant has lost his right by lying by and, so to speak, speculating upon the possible increase in value of his shares of stock—that is to say, whether or not he has intentionally attempted to occupy the position of being able to choose between a withdrawal as of October, 1882, and a liquidation in the ordinary way by the maturity of his shares, in case he should ascertain that the latter mode would be more advantageous in a pecuniary point of view. For, it must be observed, that the defendant could not at one and the same time occupy the position of a withdrawing shareholder and also have the benefits of continuing to be a shareholder.

Upon this question the evidence on the part of the defendant is, that he has always been ready and willing to settle upon the basis proposed by him in October, 1882. That I understand to be the effect of his evidence. And I find nothing in the case to indicate that he at any time contemplated abandoning the withdrawal of his shares in the seventh series and standing on his rights as a shareholder. On the contrary, he seems always to have gone on the plan of holding the association to that withdrawal.

I think, therefore, that the defendant is entitled to stand on the withdrawal as of October, 1882.

This view renders it unnecessary to determine the effect upon the rights of the parties of the amendment to the constitution made in 1882. But the question was fully discussed, and the opinion of the court asked upon it, and I will indicate my impression. That amendment reduced the amount of interest to be allowed to withdrawing members, after the fourth year, and fixed it upon the basis of the actual earnings of the association.

Defendant contends that such change cannot affect his rights, for two reasons—*first,* because the contract between the parties must be governed by the constitution as it stood at the time of the commencement of the transaction ; and, *second,* because he was not notified of the intended change, and that it could not have been made without giving him personal notice of the meeting convened for that purpose.

I think that defendant is right, and that the complainant has failed to prove that he did have notice.   Publication in the newspapers and setting up notices in public places, or other substituted service, will not, in the absence of statutory authority, answer the purpose of a personal service.   And, besides, I doubt very much if the complainant can change its constitution so as to affect the rights of members under stock already issued, without the consent of each of such members.   The constitution is a part of the contract between the parties, and, as such, is sacred.

I will advise a decree in accordance with the foregoing views.

If the parties are unable to agree upon the amount due there will be a reference to a master, and the defendant may have twenty days from the confirmation of his report in which to pay the amount found due.   If he so pays there will be no costs on either side.   If he fails to pay, there will be a decree for foreclosure and sale, with costs from and after the confirmation of the master's report